No. 25-60102

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

JUSTIN BRYCE BROWN,

*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the Southern District of Mississippi
No. 3:23-CR-123-CWR-ASH

_____

**BRIEF *AMICI CURIAE* OF GUN OWNERS OF AMERICA, GUN OWNERS FDN., GUN OWNERS OF CALIF., FIREARMS REGULATORY ACCOUNTABILITY COALITION, INC., TENN. FIREARMS ASS'N, TENN. FIREARMS FDN., GRASS ROOTS N.C., RIGHTS WATCH INT'L, VA. CITIZENS DEFENSE LEAGUE, VA. CITIZENS DEFENSE FDN., COALITION OF NEW JERSEY FIREARM OWNERS, U.S. CONSTITUTIONAL RIGHTS LEGAL DEF. FUND, HELLER FDN., AMERICA'S FUTURE, AND CONSERVATIVE LEGAL DEF. AND ED. FUND IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE**

_____

Stephen D. Stamboulieh
Olive Branch, MS

Oliver M. Krawczyk
Carlisle, PA

John I. Harris III
Nashville, TN

June 3, 2025

Robert J. Olson*
William J. Olson
Jeremiah L. Morgan
William J. Olson, P.C.
370 Maple Ave West, Ste 4
Vienna, VA 22180-5615
(703) 356-5070
rob@wjopc.com

*Counsel of Record

Case No. 25-60102

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

JUSTIN BRYCE BROWN,
*Defendant-Appellee.*

---

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

United States of America, Plaintiff-Appellant.

Justin Bryce Brown, Defendant-Appellee.

Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Firearms Regulatory Accountability Coalition, Inc., Tennessee Firearms Association, Tennessee Firearms Foundation, Grass

ii

Roots North Carolina, Rights Watch International, Virginia Citizens Defense League, Virginia Citizens Defense Foundation, Coalition of New Jersey Firearm Owners, U.S. Constitutional Rights Legal Defense Fund, Heller Foundation, America's Future, and Conservative Legal Defense and Education Fund, *Amici Curiae*.

Robert J. Olson, William J. Olson, Jeremiah L. Morgan, Stephen D. Stamboulieh, Oliver M. Krawczyk, and John I. Harris III are counsel for *Amici Curiae*.

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), and 5th Circuit Rule 28.2.1, it is hereby certified that *Amici Curiae* Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Firearms Regulatory Accountability Coalition, Inc., Tennessee Firearms Association, Tennessee Firearms Foundation, Grass Roots North Carolina, Rights Watch International, Virginia Citizens Defense League, Virginia Citizens Defense Foundation, Coalition of New Jersey Firearm Owners, U.S. Constitutional Rights Legal Defense Fund, Heller Foundation, America's Future, and Conservative Legal Defense and Education Fund are non-stock, nonprofit corporations, have no parent companies, and no person or entity owns them or any part of them.

iii

/s/ *Robert J. Olson*
Robert J. Olson
Attorney of Record for *Amici Curiae*

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES...................................................................... vii

INTEREST OF THE *AMICI CURIAE*................................................. 1

STATEMENT OF THE CASE................................................................ 1

ARGUMENT............................................................................................ 3

I.    THE HOME ENJOYS SPECIAL CONSTITUTIONAL
PROTECTION ............................................................................ 5

    A. HISTORICAL REGULATIONS OF "DANGEROUS AND UNUSUAL
WEAPONS" RESPECTED MERE POSSESSION WITHIN THE HOME ..... 5

    B. HISTORY CONFIRMS THAT POSSESSION WITHIN THE HOME WAS
NEVER RESTRICTED....................................................... 9

II.   THE DISTRICT COURT FAITHFULLY APPLIED *HELLER*
AND *BRUEN'S* METHODOLOGY.......................................... 14

III.  THE GOVERNMENT'S ARGUMENT INVITES PROHIBITED
INTEREST BALANCING ......................................................... 19

    A. THE GOVERNMENT'S "COMMON USE" THEORY AMOUNTS TO THINLY
VEILED INTEREST BALANCING ....................................... 19

    B. THE GOVERNMENT'S "DANGEROUSNESS" ARGUMENT IS
UNTETHERED FROM CONSTITUTIONAL TEXT OR HISTORICAL
UNDERSTANDING....................................................... 24

IV.  THE FOUNDERS WOULD HAVE EMBRACED
MACHINEGUNS, NOT BANNED THEM ............................... 27

CONCLUSION ............................................................................. 32

# TABLE OF AUTHORITIES

## U.S. CONSTITUTION

Amendment I ................................................................................ 7, 26

Amendment II ........................................................................ 2, *passim*

Amendment III .................................................................................. 14

Amendment IV ......................................................................... 6, 7, 14

## STATUTES

18 U.S.C. § 922(o) ................................................................. 2, 14, 18

18 U.S.C. § 922(g) .................................................................... 12, 19

18 U.S.C. § 924(a)(2) ............................................................................ 2

26 U.S.C. § 5811 .................................................................................. 2

26 U.S.C. § 5841 .................................................................................. 2

26 U.S.C. § 5845(b) ............................................................................. 2

26 U.S.C. § 5861 .................................................................................. 2

## CASES

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Platkin*, 742 F.Supp.3d 421
(D.N.J. 2024) ................................................................................ 10

*Aymette v. State*, 21 Tenn. 154 (1840) ............................................. 10

*Barnett v. Raoul*, 671 F.Supp.3d 928 (S.D. Ill.) ...................................... 31

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) .......... 10, 11, 31

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ....................................... 5

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................... 5, *passim*

*Duncan v. Bonta*, 695 F.Supp.3d 1206 (S.D. Cal. 2023) ......................... 31

*Duncan v. Bonta*, 133 F.4th 852 (9th Cir. 2025) ................................... 10

*Florida v. Jardines*, 569 U.S. 1 (2013) ............................................. 3, 7

*Hanson v. Smith*, 120 F.4th 223 (D.C. Cir. 2024) ................................. 11

*Haynes v. Tennessee*, 24 Tenn. 120 (1844) ............................................. 10

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) ............................ 4, *passim*

*Lawrence v. Texas*, 539 U.S. 558 (2003) .................................................... 7

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ....... 2, *passim*

*Osterweil v. Bartlett*, 706 F.3d 139 (2d Cir. 2013) .................................... 7

*Porter v. Ascension Par. Sch. Bd.*, 393 F.3d 608 (5th Cir. 2004) ............. 7

*Range v. AG U.S.*, 124 F.4th 218 (3d Cir. 2024) ............................. 18, 19

*Silveira v. Lockyer*, 328 F.3d 567 (9th Cir. 2003) ................................... 31

*Snope v. Brown*, No. 24-203, slip opinion (June 2, 2025) ............. 5, 17, 22
*Stanley v. Georgia*, 394 U.S. 557 (1969)..................................................7
*Thompson v. Rahr*, 885 F.3d 582 (9th Cir. 2018) ...................................7
*United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024)...................... 11
*United States v. Cooper*, 127 F.4th 1092 (8th Cir. 2025)...................... 12
*United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020)...................3, 7
*United States v. Rahimi*, 602 U.S. 680 (2024) ........................... 5, *passim*
*United States v. Veasley*, 98 F.4th 906 (8th Cir. 2024).......................... 12
*United States v. Williams*, 113 F.4th 637 (6th Cir. 2024) ......... 16, 17, 19

## MISCELLANEOUS

An Act to Prevent the Carrying of Concealed Weapons, and for Other
      Purposes, Feb. 28, 1878, ch. XLVI, § 2, Laws of the State of
      Mississippi................................................................................. 11, 12
J. Bishop, II <u>Commentaries on the Criminal Law</u> (1868) ...................... 31
William Blackstone, *Commentaries on the Laws of England*
      (John Taylor Coleridge ed., 1825) ................................................ 7, 8
Ch. 25, art. 47, § 7, The Statutes of Oklahoma: 1890 ........................... 12
Tench Coxe, Letter to the *Pennsylvania Gazette*, Feb. 20, 1788 ...... 29, 30
J. Gibson, <u>A War Without Rifles: The 1792 Militia Act and the War of
      1812</u> (2016) ..................................................................................... 29
S. P. Halbrook, <u>America's Rifle: The Case for the AR-15</u> (Bombardier
      Books: 2022) ................................................................................... 17
Benjamin Levin, *A Defensible Defense?: Reexamining Castle Doctrine
      Statutes*, 47 HARV. J. LEGIS. 523 (2010) ........................................ 6
Militia Act of May 8, 1792, ch. 33, § 4, 1 STAT. 271-273................... 21, 23
R. Perry & J. Cooper, eds., <u>Sources of Our Liberties</u> (Am. Bar Found.,
      rev. ed. 1978) ................................................................................. 14
J. Pomeroy, <u>An Introduction to the Constitutional Law of the United
      States</u> (1868)................................................................................... 30
J. Story, *Commentaries on the Constitution of the United States*, § 1900
      (5th ed. 1891)................................................................................. 14
C. Sumner, <u>The Kansas Question, Senator Sumner's Speech, Reviewing
      the Action of the Federal Administration Upon the Subject of
      Slavery in Kansas</u> 22-23 (G.S. Blanchard: 1856) ......................... 30
Francis Wharton, *A Treatise on the Criminal Law of the United States*
      (2d ed. 1852) ...................................................................................9

Samuel Whiting, *et al.*, <u>Second American Edition of the New Edinburgh</u> <u>Encyclopædia</u> (1813) ...................................................................... 30

## INTEREST OF THE *AMICI CURIAE*[1]

*Amici Curiae* are tax-exempt nonprofit organizations under Sections 501(c)(3), 501(c)(4), or 501(c)(6) of the Internal Revenue Code. Each organization participates actively in the public policy process, and has filed numerous *amicus curiae* briefs in federal and state courts defending U.S. citizens' rights against government overreach.

## STATEMENT OF THE CASE

In 2022, law enforcement raided the home of Justin Bryce Brown, investigating his alleged receipt of international shipments of so-called "machinegun conversion devices." ROA.61-62. During the raid, authorities seized an AR-15-style rifle equipped with a three-position safety selector switch. ROA.63. During a later examination, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") claimed that the third selector position allowed the firearm to fire fully automatically.

---

[1] It is hereby certified that no counsel for a party authored this brief in whole or in part; and that no person other than these *amici curiae*, their members, or their counsel made a monetary contribution to its preparation or submission. A motion for leave to file accompanies this brief.

ROA.63.  Accordingly, ATF classified the firearm as a "machinegun" under federal law.  *See* 26 U.S.C. § 5845(b).

Dating to 1934, the National Firearms Act ("NFA") generally requires privately possessed machineguns to be taxed and registered with the federal government.  *See* 26 U.S.C. §§ 5811, 5841.  Failure to comply with the NFA's paperwork and tax requirements constitutes a felony punishable by up to 10 years in prison.  *See* 18 U.S.C. § 924(a)(2). These criminal penalties reach even the simple possession of regulated firearms within the home.  *See* 26 U.S.C. § 5861.  Then, in 1986, Congress enacted 18 U.S.C. § 922(o), which generally bans newly made machineguns, limiting ordinary civilian possession to those that had been registered prior to the section's effective date.

Charged with the possession of an unregistered machinegun, Mr. Brown moved to dismiss, arguing that the statute's criminalization of his peaceful possession of a firearm within his home violates the Second Amendment, as applied.  *United States v. Brown*, 2025 U.S. Dist. LEXIS 23823, at *1-2 (S.D. Miss. Jan. 29, 2025).  The district court granted Mr. Brown's motion, concluding that the United States had failed to bear its burden to show relevant historical analogues under *N.Y. State Rifle &*

2

*Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). The United States timely appealed.

## ARGUMENT

The government does not allege that Mr. Brown committed any violent act, engaged in any other criminal activity, or caused a disturbance *with* his unregistered machinegun, or that he ever publicly carried it outside his *home*. Rather, Mr. Brown merely kept a machinegun within his domicile – a location that the U.S. Supreme Court has described as "first among equals," and where this Court has explained "the individual right is at its zenith." *Florida v. Jardines*, 569 U.S. 1, 6 (2013); *United States v. McGinnis*, 956 F.3d 747, 753 (5th Cir. 2020).

The special status of the home has both constitutional and historical significance. On appeal, the government relies on historical regulation of the *public carry* for *improper use* of "dangerous and unusual weapons" to justify criminalizing the simple *possession* of a firearm *within the home*. Setting aside this glaring analogical discrepancy under *Bruen*, historical regulations of *conduct with* "dangerous and unusual

weapons" never extended to the home.[2]  In fact, the home was *expressly exempt*.

The district court applied *Bruen* faithfully.  Undermining the government's polestar reliance on *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016), *Bruen* clarified the rigorous historical standard all courts must apply to the Second Amendment.  And that standard makes clear that *all* instruments constituting bearable arms – yes, even machineguns – are at least *presumptively* protected under the Second Amendment's plain text.  Thus, if the government wishes to regulate any bearable arm's simple possession, it has the burden to show a Founding-era historical tradition of similar regulation.  The government failed to show any such tradition below, and it once again fails to do so here.

The government's remaining arguments likewise fail.  Application of the extra-constitutional approach which the government proposes would invite interest balancing back into Second Amendment analysis.  Indeed, if the government can criminalize any politically controversial weapon by simply labeling it "dangerous and unusual" then, as Justice

---

[2] *Amici* do not concede that machineguns are inherently or universally "dangerous" or "unusual."  The point is that, even if they are, their mere peaceful possession within the home cannot be banned.

Thomas recently noted, "the most popular rifle in America" would be at risk because "ATF could at any time declare AR-15s to be machineguns." *Snope v. Brown*, No. 24-203, slip op. at 7-8 (June 2, 2025) (Thomas, J., dissenting from denial of certiorari).[3]  Yet "the scope of the right to bear arms cannot turn on judicial speculation about the American people's self-defense needs. … That is 'no constitutional guarantee at all.'" *Id*. at 6, 8.

## I.    THE HOME ENJOYS SPECIAL CONSTITUTIONAL PROTECTION.

### A. Historical Regulations of "Dangerous and Unusual Weapons" Respected Mere Possession Within the Home.

Both below and on appeal, the government invoked "the historical tradition of prohibiting the *carrying*[4] of 'dangerous and unusual weapons'" to justify its criminalization of a machinegun possessed within Mr. Brown's home.[5]  *Heller* at 627; *see* Brief of Appellant at 20; *Brown* at

---

[3] https://www.supremecourt.gov/opinions/24pdf/24-203_5ie6.pdf.

[4] Each time the Supreme Court discusses "dangerous and unusual weapons," it does so in the context of publicly "*carrying*" them, not merely *keeping* them within the home.  *See District of Columbia v. Heller*, 554 U.S. 570, 627 (2008); *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016); *Bruen* at 4; *United States v. Rahimi*, 602 U.S. 680, 691 (2024).

[5] *Amici* do not concede that machineguns can be restricted or their possession banned outside the home.  Rather, their argument is that, at

*4. But as the district court rightly observed, "[n]one of the government's proffered 'historical regulations[]' … are 'relevantly similar' to criminalizing possession of a firearm *in one's home*." *Brown* at *6 (emphasis added). In fact, closer examination of the historical record reveals not only the absence of a tradition to support the government's regulation, but also a *counter*-tradition expressly protecting Mr. Brown's home.

As one of the district court's authorities observed, "[a]ccording to Blackstone, the home was valued highly enough in the cultural consciousness not only to be likened to a castle, a place where safety from enemies should be guaranteed, but also to confer a certain degree of *immunity from the state*." *Id.* at *6 n.4 (emphasis added) (quoting Benjamin Levin, *A Defensible Defense?: Reexamining Castle Doctrine Statutes*, 47 Harv. J. Legis. 523, 530 (2010)). Indeed, courts have recognized and reiterated this principle time and again. *Heller*, for example, explained that the home is "where the need for defense of self, family, and property is most acute." *Heller* at 628. And in the Fourth

---

a minimum, as applied to mere peaceful possession within the home, the government is not at liberty to flatly prohibit a certain class of arms.

Amendment context, the Supreme Court recently reminded that "the home is first among equals," where one may retreat "and there be free from unreasonable governmental intrusion." *Jardines* at 6. Accordingly, there is a broad consensus among the circuits – including this one – that constitutional protections reach their "zenith in the home." *McGinnis* at 753; *see also Osterweil v. Bartlett*, 706 F.3d 139, 144 (2d Cir. 2013); *Thompson v. Rahr*, 885 F.3d 582, 589 (9th Cir. 2018) (Fourth Amendment); *Porter v. Ascension Par. Sch. Bd.*, 393 F.3d 608, 617 (5th Cir. 2004) (First and Fourth Amendments); *Stanley v. Georgia*, 394 U.S. 557, 565 (1969) (First Amendment). It follows that, for many governmental regulations, the home is simply off-limits. *See Lawrence v. Texas*, 539 U.S. 558, 562 (2003) ("In our tradition the State is not omnipresent in the home.").

Rather than bucking this constitutional trend, the government's proffered "dangerous and unusual" history *supports* it. When the *Heller* Court recognized a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" (*Heller* at 627), it did so by citing Sir William Blackstone's *Commentaries on the Laws of England*. And as Blackstone made clear, such a prohibition was an "Offence[] Against the

*Public* Peace."  4 William Blackstone, *Commentaries on the Laws of England* 142 (John Taylor Coleridge ed., 1825) (emphasis added).[6] Accordingly, it shared a common theme with the 12 other common-law offences with which it was codified.  All were "either … an actual breach of the peace; or constructively so, by tending to make others break it."  *Id.* The relevant text of this historical regulation reads:

> The offence of *riding* or *going armed*, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton....  [*Id.* at 149.]

Mr. Brown's simple possession of a machinegun within his home never would have been criminalized under the common law.  As the district court explained, "[h]e wasn't going or riding anywhere."  *Brown* at *6.  And he did nothing "against the 'public peace.'  Mr. Brown was not 'armed offensively,' nor was he attempting to terrorize the 'good citizens.'" *Id.*  In fact, Mr. Brown was not in public at all – an essential element of the common-law crime.  Nor did his mere possession of a firearm privately within his own home "terrify[]" anyone – another essential element of the common-law crime.  Properly understood, the historical

---

[6] https://archive.org/details/commentariesonl04blacgoog/page/n174/mode/2up.

offense on which the government relies *could only be committed in public*, a place Mr. Brown's machinegun was never alleged to have been.

A later treatise by Francis Wharton confirms this historical understanding, explaining that:

> [T]here may be an affray where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law.... [But] *it is clear that no one incurs the penalty of the statute for assembling his neighbours and friends in his own house, against those who threaten to do him any violence therein, because a man's house is his castle.* [Francis Wharton, *A Treatise on the Criminal Law of the United States* 726-27 (2d ed. 1852) (emphasis added).[7]]

It stands to reason that, if the government wishes to invoke the "historical tradition" of regulating so-called "dangerous and unusual weapons," then the historical exceptions must apply as well.

## B. History Confirms that Possession Within the Home Was Never Restricted.

Although such restrictions certainly did not exist at the Founding (the relevant time period), certain states began to legislate with respect to so-called "Bowie knives" beginning in the mid-to-late 1800s. But even

---

[7] https://babel.hathitrust.org/cgi/pt?id=mdp.35112101897975&seq=764.

so, "[f]ew states prohibited the complete sale of Bowie knives. Indeed, the mainstream approach to Bowie knife regulation was to 'ban concealed carry, to forbid sales to minors, or to impose extra punishment for criminal misuse[,] not to wholesale ban their possession.'" *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Platkin*, 742 F.Supp.3d 421, 451 (D.N.J. 2024). For example, upholding a conviction for carrying a concealed Bowie knife, the Tennessee Supreme Court explained that its state restriction existed "to preserve the *public peace*, and protect our citizens from the *terror* which a wanton and unusual *exhibition of arms* might produce...." *Aymette v. State*, 21 Tenn. 154, 159 (1840) (emphasis added); *see also Haynes v. Tennessee*, 24 Tenn. 120, 122 (1844).

As the Ninth Circuit similarly recounted, "[b]y 1840, at least five States or territories had enacted laws *restricting the carrying* of Bowie knives or other fighting knives. By the end of the 19th century, nearly every State had enacted laws restricting Bowie knives, including by outlawing their concealed or unconcealed *carry* and *sale*, by enhancing criminal penalties for their *use*, or by *taxing* their ownership." *Duncan v. Bonta*, 133 F.4th 852, 875-76 (9th Cir. 2025) (emphasis added); *see also Bevis v. City of Naperville*, 85 F.4th 1175, 1216-17 (7th Cir. 2023)

10

(Brennan, J., dissenting) ("The Bowie knife was not categorically banned, just burdened in certain ways," in contrast with a statute "prohibiting the sale and eventually the possession of the banned firearms."); *Hanson v. Smith*, 120 F.4th 223, 272 (D.C. Cir. 2024) (Walker, J., dissenting) ("none of these laws banned Bowie knives from the home," in contrast with "D.C.'s total ban … on arms").

Similarly, with respect to firearm restrictions applied to those under the influence of drugs or alcohol, this Court has recently explained that a ban on mere possession historically was off the table. In *United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024), this Court found that "*no* laws at the Founding approximate [18 U.S.C.] § 922(g)(3)" because, while "some laws banned *carrying* weapons while under the influence, none barred gun *possession* by regular drinkers." *Id.* at 280. For example, Mississippi and Oklahoma criminalized the sale of weapons to those visibly intoxicated and the *carry* of weapons at "any *[public] place* where intoxicating liquors [we]re sold," respectively. An Act to Prevent the Carrying of Concealed Weapons, and for Other Purposes, Feb. 28, 1878, ch. XLVI, § 2, Laws of the State of Mississippi, Passed at a Regular

Session of the Mississippi Legislature, at 175; Ch. 25, art. 47, § 7, The

Statutes of Oklahoma: 1890, at 496 (1891) (emphasis added).

The Eighth Circuit is in accord, explaining that, "[f]or drinkers, the

focus was on the *use* of a firearm, *not its possession*. And the few

restrictions that existed during colonial times were temporary and

narrow in scope." *United States v. Veasley*, 98 F.4th 906, 911 (8th Cir.

2024) (emphasis added); *see also id.* at 913 (emphasis added) (discussing,

with respect to the mentally ill, "[t]hose who posed no danger *stayed at*

*home* with their families, and their civil *liberties remained intact*").

Indeed, the Eighth Circuit opined that Section 922(g)(3) would be

unconstitutional as applied to "a frail and elderly grandmother who used

marijuana for a chronic medical condition … [and] 'in *possession* of a

shotgun' to defend her *home*." *United States v. Cooper*, 127 F.4th 1092,

1094 (8th Cir. 2025) (emphasis added); *see also id.* at 1098-99 (remanding

for consideration of as-applied challenge based on firearm possession

*within his home* "for *protection*," a place "where the need for defense of

self, family, and property is most acute").

Finally, surety statutes "required certain individuals to post bond

before carrying weapons in public," but "only … [on] specific showing of

'reasonable cause to fear an injury, or breach of the peace.'" *Bruen* at 55, 56; *see also Rahimi* at 696 (noting that, in 1795, Massachusetts "authoriz[ed] justices of the peace to 'arrest' all who 'go armed offensively [and] require the offender to find sureties for his keeping the peace,'" and the "imposition of bonds from individuals '[who went] armed'"). Once again, these historical examples for the most part targeted only *public carry*, rather than prohibiting mere possession of a firearm *within the home*.

The historical trend is clear. The founding generation was reluctant to entirely ban firearm possession *by anyone*. And when certain *types* of weapons were restricted, the limitations almost always amounted to *prohibited uses* (terror, affray, *etc.*), not *mere possession*. *Amici* are aware of *no* historical example from the relevant Founding era banning the *peaceful possession* of an entire class of arms *within the home*. Thus, the government cannot constitutionally criminalize Mr. Brown's simple possession of a firearm within his own home. The Founders *never* invaded the people's homes in such a manner. And they

fought a war against those who did.[8]  This Court should decline to venture there now.

## II. THE DISTRICT COURT FAITHFULLY APPLIED *HELLER* AND *BRUEN*'S METHODOLOGY.

On appeal, the government urges this Court to decide Mr. Brown's case using little more than *Hollis*.  *See* Brief of Appellant at 12.  But as a pre-*Bruen* decision, *Hollis* lacked the benefit of *Bruen*'s explication of the Second Amendment's controlling textual standard and historical framework.  Thus, the district court was right to reexamine 18 U.S.C. § 922(o) under *Bruen*.  And following *Bruen*, this Court should observe some key precepts.

First, in *Heller*, the Supreme Court made clear that "the Second Amendment extends, prima facie, to all instruments that constitute

---

[8] Like the Second, the Third and Fourth Amendments each was designed to secure private property against government intrusions and control.  The "plain object of [the Third Amendment] is to secure the perfect enjoyment of that great right at common law, that a man's house shall be his own castle, privileged against all civil and military intrusion." 2 J. Story, *Commentaries on the Constitution of the United States*, § 1900, at 647 (5th ed. 1891).  Similarly, the Fourth Amendment "grew out of the use by British officials of general warrants … to search for seditious publications."  R. Perry & J. Cooper, eds., Sources of Our Liberties 427 (Am. Bar Found., rev. ed. 1978).  In other words, having just experienced the tyrannies of the British Crown, the Founders were uniquely concerned about preserving *maximum freedom* within the home.

bearable arms, even those that were not in existence at the time of the founding." *Heller* at 582. That language of *presumption*[9] maps neatly onto (i) *Bruen*'s later statement that, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and (ii) the Court's instruction that "*we use history to determine which modern 'arms' are protected by the Second Amendment.*" *Bruen* at 17, 28 (emphasis added). And with respect to *history*, the government bears the burden. *See id.* at 24.

Thus, the government must justify its criminalization of mere possession of a firearm within the home by "demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* And, absent a similar tradition reaching simple possession of certain classes of firearms, the district court's dismissal was proper. *See id.* at 17 (emphasis added) ("*Only if* a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'").

---

[9] "Prima facie" means "legally sufficient to establish a fact or a case unless disproved." *Prima Facie*, <u>Merriam-Webster</u>, <u>https://www.merriam-webster.com/dictionary/prima%20facie</u> (last visited June 3, 2025).

Second, *Bruen* clarified the expansive scope of the Second Amendment's presumptively protected "Arms." *Heller* explained that the Founders understood the term "Arms" to cover (1) "'[w]eapons of offence, or armour of defence,'" (2) "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another,'" and (3) "all firearms." *Heller* at 581. And for an "Arm" to be "bearable" – and therefore something to which "the Second Amendment extends, prima facie" – it must be something that one may "wear, bear, or carry … upon the person or in the clothing or in a pocket." *Id.* at 582, 584 (internal quotations omitted).

Confirming this understanding, *Bruen* explained that, "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition *covers* modern instruments that *facilitate* armed self-defense." *Bruen* at 28 (emphasis added). *Hollis* did not conduct this historical analysis, which this Court must undertake now. *See United States v. Williams*, 113 F.4th 637, 645 (6th Cir. 2024) ("[T]he Supreme Court's mode of analysis has changed since we last upheld [the statute's] constitutionality. *Bruen* requires a

16

history-and-tradition analysis that our circuit hasn't yet applied to this statute.  That means we must revisit our prior precedent.").

Mr. Brown's machinegun easily satisfies the basic definition of "arms," and so it is presumptively protected under the Second Amendment's plain text.  Indeed, Mr. Brown's machinegun started life as a quintessential AR-15 – a semiautomatic firearm known as "America's rifle"[10] and owned by tens of millions of Americans.  *See Snope*, slip op. at 1 (Kavanaugh, J., statement respecting denial of certiorari).  Such firearms are quite obviously arms "[b]y any measure." *Snope*, slip op. at 5 (Thomas, J., dissenting from denial of certiorari).  And it would defy logic to conclude that this very same AR-15 rifle loses its status as an "arm" here, merely by its conversion to fire fully automatically – *i.e.*, the addition of a couple small internal fire control components.[11]

---

[10] S. P. Halbrook, <u>America's Rifle: The Case for the AR-15</u> (Bombardier Books: 2022).

[11] The distinction between semiautomatic and fully automatic often is mechanically minor even if legally significant.  Other popular semiautomatic firearms can be converted to fully automatic fire with objects as simple as a popsicle stick, or a "piece of 3/32" wire." *See* https://www.survivorlibrary.com/library/full-auto_conversion-sks_and_variants.pdf.  That reality does not negate their status as "arms."

Thus, whether a semiautomatic rifle or a fully automatic machinegun, Mr. Brown's AR-15 is a "[w]eapon of offence," being "any thing that a man … takes into his hands, or useth in wrath to cast at or strike another" with projectiles. It is a "firearm" that may be worn on the person or carried in the hand. And it is a "modern instrument[]," not in existence at the Founding, that "facilitate[s] armed self-defense." Indeed, if one were being attacked, a machinegun would fare far better than hands and fists. Especially within the home. *See Brown* at *6 n.4. Thus, "although the Second Amendment's text is fixed, its application keeps up with the times." *Id.* at *11; *see Rahimi* at 692 ("[h]olding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers"). By holding the government to its historical burden, the district court stayed true to the analysis *Heller* and *Bruen* demand.

Third, even if the government were correct (it is not) that *Hollis* still has some precedential application, the as-applied question presented here was not at issue in *Hollis*, which resolved only a facial challenge to Section 922(o). *Hollis* never considered a limited challenge based on mere possession within the home. And courts routinely consider as-applied challenges even after facially upholding a statute. *See Range v. AG U.S.*,

18

124 F.4th 218, 285 (3d Cir. 2024) (Roth, J., concurring) ("facial constitutionality of § 922(g)(1) is not up for debate under this presumption," but holding § 922(g)(1) unconstitutional "as-applied"); *see also Williams* at 644, 657 ("Every court of appeals to consider a facial challenge [to § 922(g)(1)] rejected it" but stating that "history shows that § 922(g)(1) might be susceptible to an as-applied challenge in certain cases."); *Bruen* at 38 n.9 (expressly inviting as-applied challenges to "shall-issue" licensing regimes). *Hollis* in no way forecloses the appeal here.

## III.  THE GOVERNMENT'S ARGUMENT INVITES PROHIBITED INTEREST BALANCING.

### A. The Government's "Common Use" Theory Amounts to Thinly Veiled Interest Balancing.

On appeal, the government suggests that "the Second Amendment *applies* only to firearms that are 'in common use … for lawful purposes like self-defense' and does not *apply* to … 'dangerous and unusual weapons.'" Brief of Appellant at 8 (emphasis added). The district court was correct to reject such revisionism below. Taken to its logical conclusion, the government's argument reinvites precisely the sort of

"judge-empowering 'interest-balancing inquiry'" that *Heller*, *McDonald*, and *Bruen* repudiated. *Bruen* at 22.

First, the government offers no authority for its suggestion that the Second Amendment does not so much as "*apply*" – in any way – to firearms that are not "in common use." And for good reason. In *Bruen*, the Supreme Court clarified that "the Second Amendment protects only the *carrying* of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Id.* at 47 (emphasis added). *Bruen* did not qualify simple possession – or the mere keeping of firearms within the home – with commonality. To the contrary, *Bruen* explained that the Second Amendment broadly applies to all "modern instruments that facilitate armed self-defense." *Id.* at 28. The government did not accuse Mr. Brown of *carrying* his machinegun, and so inquiry into its commonality "in society at large" (*Heller* at 627) is inapposite.

*Bruen*'s own language confirms that historical regulations of "dangerous and unusual weapons" at best justified restrictions on public carry. Responding to the argument that "handguns were considered 'dangerous and unusual' during the colonial period," the Court explained

that such colonial laws reached only "the *carrying* of 'dangerous and unusual weapons'" and that in any case, "they provide no justification for laws restricting the *public carry* of weapons that are unquestionably in common use today." *Bruen* at 47 (emphasis added). Indeed, even if handguns were once considered too "dangerous and unusual" to carry, no early jurisdiction ever banned their *possession* altogether.[12] *See Heller* at 629 ("Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban."). The government misreads the Supreme Court's precedents.

Second, the government's reliance on *Hollis* would absolve it from the historical test that *Bruen* directed courts to apply "[w]hen the Second Amendment's plain text covers an individual's conduct." *Bruen* at 24. In its place, judges would be empowered to decide threshold textual questions using something other than the Supreme Court's methodological framework. In this Court's pre-*Bruen Hollis* decision, a three-judge panel held that "a law that regulates a class of weapons that

---

[12] On the contrary, Congress actually mandated the acquisition and ownership – and by implication, the possession in the home – of pistols in furtherance of citizens' required enrollment in the militia and to be ready to present themselves for duty with such pistols. *See* Militia Act of May 8, 1792, ch. 33, § 4, 1 Stat. 271, 273.

are not in common use will be upheld at step one." *Hollis* at 447. But "common use" is no prerequisite to holding the government to its historical burden. Rather, *Bruen* made clear that "*we use history* to determine which modern 'arms' are protected by the Second Amendment." *Bruen* at 28 (emphasis added). And as Justice Thomas recently explained with respect to semiautomatic AR-15 rifles, "[a] challenger need only show that 'the plain text' of the Second Amendment covers his conduct." *Snope*, slip op. at 3-4 (Thomas, J., dissenting from denial of certiorari). And, because "AR-15s are clearly 'Arms' under the Second Amendment's plain text" (*id.* at 2), nothing more is needed to hold the government to its historical burden.

Third, even if this Court were to create a "common use" prerequisite to the Second Amendment's very *application*, the Supreme Court's "common use" precedents are far broader than the government claims here. Rather than qualifying that a weapon must be "in common use *by civilians*," as the government apparently believes, *Heller* explained that "[t]he traditional militia was formed from a pool of men bringing arms 'in common use *at the time*.'" *Heller* at 624 (emphasis added). Thus, the commonly used "'ordinary military equipment'" that Founding-era

militias[13] used was that which was "in common use" *by militaries across the world* "at the time." *Id.* With this historical underpinning, the *Hollis* panel's focus on the "175,977 pre-1986 civilian-owned machineguns in existence" was far too narrow. *Hollis* at 449.[14]

Properly understood, machineguns like Mr. Brown's are "in common use" because they are commonly used by civilians, police forces, governments, and militaries across the Western world. For example, more than two decades ago in 2003, Colt Defense Weapon Systems reported that "over 8 million M16 weapon systems have been produced and placed in military service throughout the world" – not including the M16s produced by the numerous *other* suppliers of ordinary military equipment,[15] or the untold millions of such firearms that have been produced in the past 22 years. The same is true for the ubiquitous

---

[13] *See* §§ 1 & 4, 1 STAT. at 271-73 (mandating that all militia members provide themselves with an extensive list of military weapons and equipment of the era).

[14] Truthfully, so too was the district court's focus on the "more than 740,000 machineguns lawfully possessed in the United States," which incorporated ownership numbers of "civilian"-owned business entities. *Brown* at *8.

[15] https://web.archive.org/web/20030602074644/http://www.colt.com/mil/M16.asp.

handgun – a staple sidearm for civilians, militaries, and police forces the world over.  *See Heller* at 629.

Applying the government's suggested limitations on the Second Amendment's scope would divest "the people" of the classes of arms that the Second Amendment was specifically intended to protect.  And it would empower courts to decide Second Amendment cases using something other than the historical tradition that *Bruen* mandated.  This Court should reject the invitation.

## B. The Government's "Dangerousness" Argument Is Untethered from Constitutional Text or Historical Understanding.

Keying in on the historical regulation of publicly carrying certain "dangerous and unusual weapons," the government also argues that this standard permits some sort of open-ended balancing – rather than rigorous historical inquiry – into what sorts of weapons are too "dangerous."  To that end, the government lists a parade of horribles, claiming that machineguns are categorically "dangerous."  Brief of Appellant at 26-27 (discussing "firepower," "immense danger," "rounds per minute," "sophisticat[ion]," "unlawful uses," and "protection of

drugs"). As the government posits, machineguns certainly are "much more dangerous ... than semiautomatic pistols and rifles...." *Id.* at 26.

But this is not the objective inquiry into original meaning that *Heller* and *Bruen* directed. Following the government's logic – that an M16 can be banned because it is "much more dangerous" than an AR-15 – then (1) a semiautomatic AR-15 rifle with detachable 30-round magazine could be banned as well, since it certainly is "much more dangerous" than an 8-round fixed-magazine M1 Garand, (2) which is "much more dangerous" than a lever-action Winchester 30-30, (3) which is "much more dangerous" than a breech-loading Sharps rifle, (4) which, in turn, is "much more dangerous" than the muzzle-loading muskets and rifles available during the Founding era.

The district court rightly rejected this race-to-the-bottom "dangerousness" argument, which represents little more than a naked plea for "judicial deference to legislative interest balancing" in which judges decide for themselves just how "dangerous" they will allow the people's "Arms" to be. *Bruen* at 26. As the district court noted, even "[r]evolvers satisfy the ordinary definition of the word 'dangerous,'" and "[s]emiautomatic weapons are arguably more dangerous than revolvers."

25

*Brown* at *6-7.  But even so, "firearms can be [both] dangerous and constitutionally protected" because, "although the Second Amendment's text is fixed, its application keeps up with the times."  *Id.* at *8, *11.

Indeed, the availability to instantaneously reach the world using X (formerly Twitter) via any smartphone is infinitely more powerful a tool of speech than a quill pen and ink – but that does not make social media any less deserving of First Amendment protection than pamphleteering. *See Heller* at 629 ("no answer to say" possession of one type of firearm may be banned "so long as the possession of other firearms … is allowed"); *Rahimi* at 692 ("Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.").

At no point has the Supreme Court endorsed such inquiries into the *what-ifs* of weapons.  That is evidence enough that such inquiries depart from, rather than comport with, the textual and historical standard.  *See Brown* at *5 (arguments about the "benefits to public safety … are policy arguments entitled to no weight"); *see also Rahimi* at 717 (Kavanaugh, J., concurring) ("History, not policy, is the proper guide.").

## IV.   THE   FOUNDERS   WOULD   HAVE   EMBRACED MACHINEGUNS, NOT BANNED THEM.

This Court's now abrogated *Hollis* decision concluded that "whether a weapon has a nexus to military utility is not the test as to whether that weapon receives Second Amendment protection." *Hollis* at 446. Rather, according to that decision, "*Heller* … distinguished between two classes of weapons: (1) those that are useful in the militia or military, and (2) those that are 'possessed at home' and are in 'common use at the time for lawful purposes....'" *Id.* at 445 (claiming that "the Second Amendment *applies only to the second category of weapons*"). Thus, *Hollis* claimed it to be "a given that M-16s are dangerous and unusual weapons and not protected by the Second Amendment." *Id.* at 446.

On the contrary, just as "[n]othing in the Second Amendment's text draws a home/public distinction" as to where weapons can be carried (*Bruen* at 32), nothing in the text creates a civilian/military distinction as to the types of arms that can be possessed. If anything, the opposite is true. As the Court explained, the Second Amendment's prefatory militia clause "announces a purpose" for codifying the right – "to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down." *Heller* at 577, 599. And because "[l]ogic demands that there be a link between the stated purpose and the command," then – *at a minimum* – the Second

27

Amendment must protect those military-grade arms that make the guarantee effective. *Id.* at 577. At the Founding, the "'weapons used by militiamen and weapons used in defense of person and home were one and the same.'" *Id.* at 625. It was only because of that fact that "the Second Amendment's operative clause furthers the purpose announced in its preface." *Id.*

Nor is protection of military arms inconsistent with *Heller*. According to the *Hollis* panel, *Heller* found it "'startling'" that "'ordinary military equipment'" might be "'protected by the Second Amendment.'" *Hollis* at 447. But that is not what *Heller* said. Rather, the Court opined that it would be "startling" if "*only* those weapons useful in warfare are protected." *Heller* at 624 (emphasis added). Indeed, as the Court had explained, the militia clause "does not limit … grammatically" the operative right to keep and bear arms. *Id.* at 577. In other words, "[t]he prefatory clause does not suggest that preserving the militia was the *only* reason" for the Second Amendment. *Id.* at 599 (emphasis added). Thus, the Second Amendment protects not only the "militia" but also "the people" ("all Americans"), and protects not only firearms used in combat[16] but also those used for "self-defense[,] and hunting," among all other

---

[16] Given that all modern militaries equip their infantry with firearms capable of automatic fire, machineguns such as the M16 certainly constitute "ordinary military equipment."

lawful purposes. *Id.* at 581, 599. But protection of the people's militia, and the firearms needed to give it teeth, was certainly a reason – a primary reason – for the Amendment's codification.

History confirms this understanding. Given that the Founders intended the Second Amendment to protect the people's ability to resist a foreign invader or a tyrannical government that had overthrown the constitutional order, it would make little sense for the Second Amendment's protections to exclude the types of firearms used by the military.[17] With all the modern focus on *personal* self-defense, which no doubt is a critical aspect of the Second Amendment, it is easy to forget that the Second Amendment was written by people who had just revolted against a tyrannical government and were also concerned with *societal* self-defense. They therefore sought to guarantee that the People would have a final recourse should the new government they were forming turn tyrannical, or if a foreign invader toppled the fledgling Republic.

Tench Coxe, delegate to the Continental Congress and the Annapolis Convention, wrote that "Congress have no power to disarm the militia. Their swords, and every other terrible implement of the soldier,

---

[17] To the contrary, during the War of 1812, Congress took actions to ensure that military-spec firearms would be readily available for civilian purchase. *See* J. Gibson, <u>A War Without Rifles: The 1792 Militia Act and the War of 1812</u> at 78-85 (2016).

are the birthright of an American." Tench Coxe, Letter to the *Pennsylvania Gazette*, Feb. 20, 1788. Coxe reaffirmed this view in 1813, writing that "militia" members "have all the right, even in profound peace, to purchase, keep and use arms of every description," deeming this militia "the army of the constitution." Samuel Whiting, *et al.*, <u>Second American Edition of the New Edinburgh Encyclopædia</u>, vol. 1, pt. 2, at 652 (1813).

Indeed, this was the dominant Founding-era view and one that persisted for decades. Senator Charles Sumner's "The Crime Against Kansas" speech bristled at the notion that slavery opponents in Kansas should be disarmed of their then-cutting edge Sharps rifles (which could be fired far more rapidly than muzzle-loading firearms) by the pro-slavery government: "Never was this efficient weapon more needed in just self defence, than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached." C. Sumner, <u>The Kansas Question, Senator Sumner's Speech, Reviewing the Action of the Federal Administration Upon the Subject of Slavery in Kansas</u> 22-23 (G.S. Blanchard: 1856). Many contemporary legal commentators agreed. *See*, *e.g.*, J. Pomeroy, <u>An Introduction to the Constitutional Law of the United States</u> 152 (1868) ("[A] militia would be useless unless the citizens were enabled to exercise themselves in the use of warlike weapons."); J.

30

Bishop, II <u>Commentaries on the Criminal Law</u> 75 (1868) ("[T]he [Second Amendment] protects ... the right to 'keep' such 'arms' as are used for purposes of war....").

There can be no historical tradition of barring firearms just because they may be useful in combat, when one of the main purposes of the Second Amendment was as a "doomsday provision" for the People to protect themselves from a tyrannical government. *See Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing en banc). Indeed, "[o]nce one understands the history of tyrants resorting to taking away people's arms to suppress political opposition, *Heller* explains, one can see that the militia clause fits perfectly with the operative clause." *Duncan v. Bonta*, 695 F.Supp.3d 1206, 1219 (S.D. Cal. 2023). A district court in Illinois said the same:

> During the founding era, "[i]t was understood across the political spectrum that the right ... might be necessary to oppose an oppressive military force if the constitutional order broke down." ... Therefore, although "most undoubtedly thought [the Second Amendment] even more important for self-defense and hunting" the additional purpose of securing the ability of the citizenry to oppose an oppressive military,[18] should the need arise, cannot be overlooked. [*Barnett v. Raoul*, 671 F.Supp.3d 928, 940 (S.D. Ill.), *vacated sub nom. Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023).]

---

[18] *See also Silveira* at 570 (Kozinski, J., dissenting from denial of rehearing en banc) ("However improbable these contingencies may seem today, facing them unprepared is a mistake a free people get to make only once.").

31

For this reason, neither the Founders nor their immediate descendants drew any distinction between purportedly "military" and "civilian" weaponry, as they were "one and the same." *Heller* at 625; *see also id.* at 598. So too are they today.

Given this critical purpose of the Second Amendment, a ban on the prevailing military rifles of the modern age is inconsistent with "the principles that underpin our regulatory tradition." *Rahimi* at 692. To be sure, certain activities – like terrorizing the public – using certain "dangerous and unusual weapons" may be restricted if such regulation falls within the historical tradition. But an arm merely having the characteristic of being useful in combat, without more, does not fall within that tradition. *Hollis* therefore lacks not only precedential, but also any persuasive, value.

## CONCLUSION

For the foregoing reasons, the district court's dismissal of Mr. Brown's indictment should be affirmed.

Respectfully submitted,

Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
stephen@sdslaw.com

Oliver M. Krawczyk
Ambler Law Offices, LLC
115 South Hanover Street, Suite 100
Carlisle, PA 17013
(717) 525-5822 T
oliver@amblerlawoffices.com

John I. Harris
Schulman, Leroy & Bennett, P.C.
3310 West End Avenue, Suite 460
Nashville, TN 37203
jharris@slblawfirm.com

*/s/ Robert J. Olson*
Robert J. Olson*
William J. Olson
Jeremiah L. Morgan
William J. Olson, P.C.
370 Maple Avenue West, Suite 4
Vienna, VA 22180-5615
(703) 356-5070 T
(703) 356-5085 F
rob@wjopc.com
*Counsel of Record*
June 3, 2025

# CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.* in Support of Defendant-Appellee and Affirmance was made, this 3rd day of June, 2025, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

*/s/ Robert J. Olson*
Robert J. Olson
Attorney for *Amici Curiae*

## **CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

IT IS HEREBY CERTIFIED:

1.     That the foregoing Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.* in Support of Defendant-Appellee and Affirmance complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) because this brief contains 6,497 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), as well as Circuit Rule 32.1, because this brief has been prepared in a proportionally spaced typeface using Microsoft Word version 2021 in 14-point Century Schoolbook.

*/s/ Robert J. Olson*

Robert J. Olson
Attorney for *Amici Curiae*
Dated:  June 3, 2025