No. 25-60102

# In the
# United States Court of Appeals
# for the Fifth Circuit

◆

UNITED STATES OF AMERICA,

*Plaintiff–Appellant,*

v.

JUSTIN BRYCE BROWN,

*Defendant–Appellee.*

◆

On Appeal from the United States District Court for
the Southern District of Mississippi, Jackson Division
Case No. 3:23-cr-123-1

◆

**BRIEF OF THE NATIONAL RIFLE ASSOCIATION
OF AMERICA, FIREARMS POLICY COALITION, AND FPC
ACTION FOUNDATION AS *AMICI CURIAE* IN SUPPORT OF
APPELLEE AND AFFIRMANCE**

◆

CODY J. WISNIEWSKI
FPC ACTION FOUNDATION
5550 Painted Mirage Rd.,
Ste. 320
Las Vegas, NV
(615) 955-4306
cwi@fpcafhq.org

ERIN M. ERHARDT
  *Counsel of Record*
JOSEPH G.S. GREENLEE
NATIONAL RIFLE ASSOCIATION
OF AMERICA – INSTITUTE FOR
LEGISLATIVE ACTION
11250 Waples Mill Rd.
Fairfax, VA 22030
(703) 267-1161
eerhardt@nrahq.org

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.

- Plaintiff-Appellant: United States of America

- Counsel for Plaintiff-Appellant:
  - Jennifer Case, U.S. Attorney's Office, Jackson, MS
  - Samuel Goff, U.S. Attorney's Office, Jackson, MS

- Defendant-Appellee: Justin Bryce Brown

- Counsel for Defendant-Appellee: Joseph Hollomon, Joe M. Holloman & Associates, P.A., Jackson, MS

- *Amici Curiae*:
  - National Rifle Association of America
  - Firearms Policy Coalition, Inc.
  - FPC Action Foundation

- Counsel for *Amici Curiae*:
  - Erin M. Erhardt, National Rifle Association
  - Joseph G.S. Greenlee, National Rifle Association
  - Cody J. Wisniewski, Firearms Policy Coalition, Inc. and FPC Action Foundation

None of the *Amici* has a parent corporation, nor is there any publicly held corporation that owns more than 10% of any of their stock.

/s/ *Erin M. Erhardt*
Counsel for *Amici Curiae*

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................i

TABLE OF AUTHORITIES...................................................... iii

STATEMENT OF *AMICI CURIAE* ....................................... 1

SUMMARY OF ARGUMENT ................................................. 3

ARGUMENT ...................................................................... 5

    I.  The Second Amendment's plain text covers *all* bearable arms. .................................................................... 5

    II.  The "dangerous and unusual" consideration is part of the historical analysis—not the plain text analysis. ............................ 7

    III. Arms fall outside of the Second Amendment's protections only if they are *both* are "dangerous *and* unusual." ...................... 10

    IV. The district court correctly found that the government failed to carry its burden. ....................................................... 13

CONCLUSION .................................................................. 18

CERTIFICATE OF COMPLIANCE...................................... 19

CERTIFICATE OF SERVICE............................................. 20

# TABLE OF AUTHORITIES

## Cases

*Caetano v. Massachusetts,*
  577 U.S. 411 (2016) ...................................................................... *passim*

*Com. v. Caetano,*
  470 Mass. 774 (2015) ......................................................... 10

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ...................................................................... *passim*

*Hollis v. Lynch,*
  827 F.3d 436 (5th Cir. 2016) ................................................... 9

*Miller v. Bonta,*
  699 F. Supp. 3d 956 (S.D. Cal. 2023) ................................... 12

*New York State Rifle & Pistol Ass'n v. Bruen,*
  597 U.S. 1 (2022) .................................................................... *passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
  804 F.3d 242 (2d Cir. 2015) ................................................... 6

*Teter v. Lopez,*
  76 F.4th 938 (9th Cir. 2023) .................................................. 8

*United States v. Brown,*
  764 F. Supp. 3d 456 (S.D. Miss. 2025) ................................. 15

*United States v. Diaz,*
  116 F.4th 458 (5th Cir. 2024) ................................................ 9

*United States v. Miller,*
  307 U.S. 174 (1939) ................................................................ 14

*United States v. Price,*
  111 F.4th 392 (4th Cir. 2024) ................................................ 3

*United States v. Rahimi,*
  602 U.S. 680 (2024) ............................................................ 3, 13

*Virginia v. Black*,
   538 U.S. 343 (2003) ....................................................................... 6


## Constitutional Provisions

U.S. Const. amend. II ................................................................. *passim*


## Other Authorities

Black's Law Dictionary (6th ed. 1990) ....................................... 6

Blackstone's Commentaries, vol. 4 (1769) ......................... 14

Smith, Mark W., *What Part of "In Common Use" Don't You
   Understand?: How Courts Have Defied* Heller *In Arms-Ban Cases—
   Again*, Harv. J. L. & Pub. Pol'y Per Curiam (Sept. 27, 2023) ............ 14

# STATEMENT OF *AMICI CURIAE*[1]

**The National Rifle Association of America (NRA)** is America's oldest civil rights organization and a foremost defender of Second Amendment rights. It was founded in 1871 by Union generals who, based on their Civil War experiences, sought to promote firearms marksmanship and expertise amongst the citizenry. Today, the NRA is America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement. The NRA has approximately four million members, and its programs reach millions more.

**Firearms Policy Coalition, Inc. (FPC)** is a nonprofit membership organization that works to create a world of maximal human liberty and freedom and to promote and protect individual liberty, private property, and economic freedoms. It seeks to protect, defend, and advance the People's rights, especially but not limited to the inalienable, fundamental, and individual right to keep and bear arms. FPC serves its

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund its preparation or submission. No person other than *Amici* and their members contributed money intended to fund its preparation or submission.

1

members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

**FPC Action Foundation (FPCAF)** is a nonprofit organization dedicated to preserving the rights and liberties protected by the Constitution. FPCAF focuses on litigation, research, education, and other related efforts to inform the public about the importance of constitutionally protected rights—why they were enshrined in the Constitution and their continuing significance. FPCAF is determined to ensure that the freedoms guaranteed by the Constitution are secured for future generations. FPCAF's research and *amicus curiae* briefs have been relied on by judges and advocates across the nation.

This case concerns *Amici* because it is essential for the preservation of the Second Amendment that the government be held to its burden of justifying regulations on arms-related conduct.

## SUMMARY OF ARGUMENT

"In some cases, the burden makes all the difference." *United States v. Price*, 111 F.4th 392, 415 (4th Cir. 2024) (Quattlebaum, J., concurring). This is one such case. "[W]hen the Government regulates arms-bearing conduct, ... it bears the burden to 'justify its regulation.'" *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (quoting *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022)). Here, the district court correctly determined that the government failed to carry that burden.

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. There can be no question that machineguns are bearable arms. Indeed, the government does not claim otherwise. And the plain text of the Second Amendment presumptively guarantees the right to keep bearable arms. Thus, the plain text covers the conduct at issue in the instant case.

It is therefore the government's burden to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. The government mistakenly argues that machineguns are "dangerous and unusual" weapons that are unprotected

3

by *the plain text* of the Second Amendment. But whether a weapon is "dangerous and unusual" is properly determined by historical analysis; it is not relevant to the plain text of the Second Amendment.

Looking to history, the government is correct insofar as the only historical tradition the Supreme Court has identified that can justify an arms ban is on arms that are both "dangerous and unusual." Thus, to meet its burden, the government must establish that the arms at issue are both "dangerous and unusual." The district court correctly determined that the government has failed to do so here. Primarily, the government failed to demonstrate that machineguns are "unusual" *today* and instead sought to rely on decades old dicta to meet a test rooted in today.

Put simply, regardless of one's view of the arms at issue, the government did not carry its burden in the district court. Accordingly, this Court should affirm the district court's dismissal of this case.

# ARGUMENT

## I.    The Second Amendment's plain text covers *all* bearable arms.

The Supreme Court set forth "the standard for applying the Second Amendment" in *Bruen*: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24.

The initial inquiry under *Bruen*, therefore, is a plain text analysis. The Court conducted this exact plain text analysis in *District of Columbia v. Heller*, 554 U.S. 570, 576–600 (2008).

The government in this case makes much of the fact that *Bruen* only specifically considered handguns: "*Bruen* addresses a New York law limiting the ability of law-abiding citizens to carry *handguns* (not machineguns) outside the home…. The *Bruen* Court said nothing about whether *machineguns* deserve Second Amendment protection." Appellant's Br. at 29. But the Supreme Court has already recognized that "the Second Amendment extends, prima facie, to all instruments that

constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582.

Thus, "[*Heller*] identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting." *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 257 n.73 (2d Cir. 2015); *see also Virginia v. Black*, 538 U.S. 343, 369 (2003) (Scalia, J., concurring in part, concurring in judgment in part, and dissenting in part) (defining "prima facie evidence" as "sufficient to establish a given fact" and "if unexplained or uncontradicted ... sufficient to sustain a judgment in favor of the issue which it supports") (quoting BLACK'S LAW DICTIONARY 1190 (6th ed. 1990)).[2]

The government does not dispute—and thus has not rebutted—the fact that machineguns are bearable arms. Nevertheless, the government argues that machineguns fall outside of the Second Amendment's protections. Appellant's Br. at 32. While it may be true that "the right secured by the Second Amendment is not unlimited," *Heller*, 554 U.S. at

---

[2] In *Cuomo*, the Second Circuit held unconstitutional a ban on a pump-action rifle because the state focused exclusively on semiautomatic weapons and "the presumption that the Amendment applies remain[ed] unrebutted." 804 F.3d at 257 n.73.

626, any limitations on bearable arms must be considered in light of this country's historical tradition of firearm regulation, not as part of the plain text analysis. *See Bruen*, 597 U.S. at 28 ("[W]e use history to determine which modern 'arms' are protected by the Second Amendment.").

Machineguns are bearable arms covered by the Second Amendment's plain text. The government must therefore justify its ban "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

## II.  The "dangerous and unusual" consideration is part of the historical analysis—not the plain text analysis.

The Supreme Court has recognized a tradition of regulating "dangerous and unusual" weapons. In doing so, the Court established that the question of whether a particular arm is "dangerous and unusual" must be considered in the historical, rather than plain text, analysis.

*Heller* referred to "the *historical tradition*" of regulating "dangerous and unusual weapons." 554 U.S. at 627 (emphasis added); *see also Bruen*, 597 U.S. at 47 (explaining that the *Heller* Court was "[d]rawing from this *historical tradition*" of restricting "dangerous and unusual weapons" in holding that the Second Amendment protects arms "'in common use at

7

the time,' as opposed to those that 'are highly unusual in society at large'") (quoting *Heller*, 554 U.S. at 627) (emphasis added). And the *Heller* Court considered that "historical tradition" in its own historical analysis.

What is more, the Court identified that traditional regulation in the same paragraph as other "longstanding" regulations, *id.* at 626–27, while promising to "expound upon the *historical justifications* for" those regulations another time, *id.* at 635 (emphasis added). Indeed, *Heller* "did not say that dangerous and unusual weapons are not *arms*," but rather, "that the relevance of a weapon's dangerous and unusual character lies in the '*historical tradition*[.]'" *Teter v. Lopez*, 76 F.4th 938, 949 (9th Cir. 2023), *reh'g en banc granted, opinion vacated*, 93 F.4th 1150 (9th Cir. 2024), and *on reh'g en banc*, 125 F.4th 1301 (9th Cir. 2025) (quoting *Heller*, 554 U.S. at 627) (emphasis in *Teter*).

*Bruen*, too, supports this conclusion. While *Bruen* did not involve a "dangerous and unusual" weapon, its framing of the protected conduct under the plain text analysis is illuminating: the *Bruen* Court defined the conduct at issue as "bear[ing] *arms* in public for self-defense." 597 U.S. at 33 (emphasis added) (quotation marks omitted). Discussion of the

8

specific firearm at issue—there, a handgun—was left to the historical analysis. *Id*. at 34. Because the specific bearable arm is not relevant to the plain text, the characteristics of the specific arm—*i.e.*, whether it is "dangerous and unusual"—cannot be assessed in the plain text analysis.

The government relies heavily on *Hollis v. Lynch*, in which this Circuit held that machineguns are not protected by the plain text of the Second Amendment. 827 F.3d 436, 451 (5th Cir. 2016), *abrogated by United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024). But *Hollis* defined the conduct at issue too narrowly—"the keeping and bearing of an M-16 machinegun"—and consequently considered whether machineguns are "dangerous and unusual" as part of its plain text analysis. 827 F.3d at 447. The government makes the same mistake in the instant case. Appellant's Br. at 34. This is clearly inconsistent with the *Bruen* framework, which does not consider the specific bearable arm as part of the plain text analysis, and the Supreme Court's repeated recognition that whether a weapon is "dangerous and unusual" is determined through historical analysis.

**III.  Arms fall outside of the Second Amendment's protections only if they are *both* are "dangerous *and* unusual."**

"[T]he historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" is the only traditional regulation *Heller* identified in its historical analysis of restrictions on particular arms. 554 U.S. at 627. In *Caetano v. Massachusetts*, 577 U.S. 411 (2016), the Court made clear that a weapon must be *both* dangerous *and* unusual to qualify as "dangerous and unusual." In other words, "this is a conjunctive test." *Id.* at 417 (Alito, J., concurring).

*Caetano* vacated and remanded the Massachusetts Supreme Judicial Court's opinion upholding a stun gun prohibition. *Id.* at 412. The Massachusetts court upheld the stun gun ban because it found that the prohibition fell within the "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* (quoting *Com. v. Caetano*, 470 Mass. 774, 778 (2015)). The Supreme Court rejected this holding, determining that the Massachusetts court's analysis of whether stun guns were "unusual" was flawed. At that point, the Supreme Court declined to consider whether stun guns qualified as exceptionally "dangerous." *Id.* If the "dangerous and unusual" test were not a conjunctive test, the Court would have proceeded to consider whether

10

stun guns are exceptionally dangerous, because that might have justified the Massachusetts court's holding. But the *Caetano* Court did not, because it is indeed a conjunctive test, and the ban failed at the "unusual" analysis.

Justice Alito, joined by Justice Thomas, emphasized this point in a concurring opinion:

> As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual. Because the Court rejects the lower court's conclusion that stun guns are "unusual," it does not need to consider the lower court's conclusion that they are also "dangerous."

*Id.* at 417 (Alito, J., joined by Thomas, J., concurring) (citing *Heller*, 554 U.S. at 636).

Justice Thomas, who authored the *Bruen* opinion, joined by Justice Scalia, who authored the *Heller* opinion, provided additional confirmation that if either the dangerous or unusual element is not satisfied, the arm cannot be banned. Dissenting from a denial of certiorari, the Justices noted that because the banned arms in that case were common, and thus not unusual, they were protected arms—whether the arms were exceptionally dangerous did not matter since they were not unusual:

11

> *Heller* asks whether the law bans types of firearms commonly used for a lawful purpose.... Roughly five million Americans own AR-style semiautomatic rifles. The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting. Under our precedents, *that is all that is needed* for citizens to have a right under the Second Amendment to keep such weapons.

*Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039, 1042 (2015) (Thomas, J., joined by Scalia, J., dissenting from the denial of certiorari) (citations omitted) (emphasis added).

Likewise, an arm cannot be prohibited merely because it is dangerous. Rather, "[i]f *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous." *Caetano*, 577 U.S. at 418 (Alito, J., joined by Thomas, J., concurring); *see also Miller v. Bonta*, 699 F. Supp. 3d 956, 969–70 (S.D. Cal. 2023), *appeal held in abeyance*, No. 23-2979, 2024 WL 1929016 (9th Cir. Jan. 26, 2024) ("The Supreme Court carefully uses the phrase 'dangerous and unusual arms,' while the State, throughout its briefing, refers to 'dangerous [or] unusual arms.' That the State would advocate such a position is disheartening.") (brackets in original).

IV.    **The district court correctly found that the government failed to carry its burden.**

"[W]hen the Government regulates arms-bearing conduct ... it bears the burden to 'justify its regulation.'" *Rahimi*, 602 U.S. at 691 (quoting *Bruen*, 597 U.S. at 24); *see also Bruen*, 597 U.S. at 17, 24, 33–34, 38–39, 60, 70 (making clear that the government bears the burden of justifying the law with historical regulations). The government has not met that burden.

Ordinarily, determining whether a law that implicates the Second Amendment's plain text is constitutional requires reviewing the "'historical tradition of firearm regulation' to help delineate the contours of the right," and determining, based on that history, "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 691–92 (quoting *Bruen*, 597 U.S. at 17). This would require analogizing the ban at issue to historical regulations, with particular attention paid to both "how" and "why" those historical regulations burdened the Second Amendment protected right, as a means of deducing an applicable historical principle. But, in this case, the historical work has already been done: binding Supreme Court precedent lays out the contours of the test the government must meet.

"Drawing from" America's "historical tradition," *Heller* held that "the Second Amendment protects" arms that are "'in common use at the time.'" *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627). This conclusion followed from two historical traditions. First, in the Founding era, "when called for militia service able-bodied men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Heller*, 554 U.S. at 624 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)) (brackets omitted and emphasis added). And simultaneously, *Heller* identified a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " 554 U.S. at 627 (quoting 4 BLACKSTONE'S COMMENTARIES 148–49 (1769)). Of course, arms that are "in common use" are necessarily not "dangerous and unusual." Therefore, "the pertinent Second Amendment inquiry is whether [the arms at issue] are commonly possessed by law-abiding citizens for lawful purposes today." *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (emphasis omitted); *see also* Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied* Heller *In Arms-Ban Cases— Again*, HARV. J. L. & PUB. POL'Y PER CURIAM (Sept. 27, 2023), https://tinyurl.com/2mn2mznc.

14

To determine whether a weapon is unusual, "the pertinent Second Amendment inquiry is whether [a particular weapon is] commonly possessed by law-abiding citizens for lawful purposes *today*." *Caetano*, 557 U.S. at 420 (Alito, J., concurring). The government failed to carry this burden.

At the district court, Mr. Brown asserted that "there were more than 740,000 machineguns lawfully possessed in the United States in 2021." *United States v. Brown*, 764 F. Supp. 3d 456, 462 (S.D. Miss. 2025). The government did "not point[ ] to any other number" and "present[ed] no argument or explanation for why such a large figure is not somehow common." *Id*. Perhaps the government could have presented an argument or explanation on commonality, but it failed to do so before the district court.

The government points to one congressional statement and one court case, both from 1968, suggesting that criminals prefer machineguns. *Id*. Even if these statements were factual—and the government provided no evidence demonstrating that they were—*Bruen* makes clear that weapons that are "dangerous and unusual" at one time can become protected arms at a later time. *See* 597 U.S. at 47 ("Whatever

the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today.... Thus, even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today."). In other words, while the historical tradition limited to "dangerous and unusual" weapons identified by the Supreme Court remains a consistent principle, the Supreme Court has also made clear that the "arms" at issue in the right are not limited in time—just as forms of speech under the First Amendment or protections on privacy under the Fourth Amendment are not so limited. Thus, even if these arms were considered "dangerous and unusual" at some point, the government is required to demonstrate that they are "dangerous and unusual" today—a burden the district court correctly determined the government did not meet. Moreover, the fact that criminals *may* prefer machineguns is not relevant to the question of whether law-abiding individuals possess them for lawful purposes. The Supreme Court has repeatedly focused on the use of arms by law-abiding citizens, not their popularity among

criminals.[3]  At every point, the district court correctly determined that, based on the evidence presented, the government failed to meet its burden.

The government then suggests that the fact the number of machineguns "pales in comparison" to the number of other firearms somehow demonstrates that they are uncommon. Appellant's Br. at 39–40. As the concurrence stated in response to the same argument regarding stun guns in *Caetano*, "[t]his observation may be true, but it is beside the point." 577 U.S. at 420 (Alito, J., concurring). "Otherwise, a State would be free to ban *all* weapons *except* handguns, because handguns are the most popular weapon chosen by Americans for self-defense in the home." *Id.* (quotation omitted).

The inquiry ends there. *Heller* already explored the relevant history and found that the only way to ban possession of a firearm is by demonstrating that it is "dangerous and unusual" and therefore

---

[3] For instance, Justice Breyer's dissent in *Heller* argued that "handguns … are the overwhelmingly favorite weapon of armed criminals. 554 U.S. at 682 (Breyer, J., dissenting). But that did nothing to frame the Court's analysis. All that mattered to the Court was that "handguns are the most popular weapon chosen by Americans for self-defense in the home." *Id.* at 629.

unprotected by the Second Amendment. 554 U.S. at 621. Because the government did not demonstrate that machineguns are unusual it has not met its burden.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

/s/ *Erin M. Erhardt*
Erin M. Erhardt
    *Counsel of Record*
Joseph G.S. Greenlee
NATIONAL RIFLE ASSOCIATION
OF AMERICA – INSTITUTE FOR
LEGISLATIVE ACTION
11250 Waples Mill Rd.
Fairfax, VA 22030
(703) 267-1161
eerhardt@nrahq.org

Cody J. Wisniewski
FPC ACTION FOUNDATION
5550 Painted Mirage Rd.,
Ste. 320
Las Vegas, NV 89149
(615) 955-4306
cwi@fpcafhq.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 3,267 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

/s/ *Erin M. Erhardt*
Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on June 3, 2025, I served the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ *Erin M. Erhardt*
Counsel for *Amici Curiae*